560 F.2d 527
 Complaint of TUG HELEN B. MORAN, INC., as owner, and Moran
Towing & Transportation Co., Inc., as chartered
owner of the TUG DIANA L. MORAN for
exoneration from or limitation
of liability, Plaintiffs,
Moran Towing & Transportation Co., Inc., Plaintiff-Appellant,
State of Connecticut, Claimant-Appellee.
 No. 872, Docket 76-7608.
 United States Court of Appeals,
Second Circuit.
 Argued April 29, 1977.
Decided Aug. 3, 1977.
 
 1
 Robert B. Pohl, New York City, for plaintiff-appellant.
 
 
 2
 Donald M. Waesche, Jr., New York City, for claimant-appellee.
 
 
 3
 Before MANSFIELD, Circuit Judge, and SMITH* and PALMIERI,** District Judges.
 
 RUSSELL E. SMITH, District Judge:
 
 4
 The Tomlinson Bridge, which spans Quinnipiac River near its confluence with Mill River, was completed by the State of Connecticut in 1925 under a permit granted in 1922 by the Army Corps of Engineers, pursuant to the authority given by the Rivers and Harbors Act of 1899, 30 Stat. 1151, 33 U.S.C. § 401. The bridge is of the bascule-type construction, with leaves that elevate to allow the ships to pass.
 
 
 5
 The approved plans for the bridge specified that the width of the water between the bridge abutments should be 126 feet and required that no part of the leaves, when elevated, should extend over the water. To achieve this requirement, the leaves must be raised to an angle of 82 degrees above horizontal. The bridge, as constructed, cannot be elevated to an angle of more than 65 degrees above the horizontal, and the leaves, when elevated, do extend over the water.
 
 
 6
 The Tug MORAN, with the Barge BECRAFT in tow, while passing through the Tomlinson Bridge, was so maneuvered that the port side of the BECRAFT rubbed the granite abutment of the bridge, damaging both the barge and the bridge.[1] The BECRAFT was deflected to the starboard, and shortly thereafter a chock on the port side of the BECRAFT snagged a girder of the raised bascule leaf of the bridge, resulting in substantial damage to the leaf.
 
 
 7
 The State of Connecticut did not have any authorization from the Chief of Engineers and the Secretary of the Army to deviate from the approved plans.[2] The deviation was a breach of a statutorily-imposed duty, and it constituted negligence.
 
 
 8
 The district court found that the MORAN was negligently maneuvered, that such negligence was the cause of the damage, and, relying on In re Great Lakes Towing Co., 348 F.Supp. 549 (N.D.Ill.1972), concluded that the negligence of the State of Connecticut was not a legal cause of the damage.
 
 
 9
 In The Pennsylvania, 86 U.S. 125, 22 L.Ed. 148 (1873), a case involving a collision between moving vessels, the Supreme Court held that once a ship is shown to have violated a statutory rule, she then has the burden of proving that her fault could not have been one of the causes of the accident. The State of Connecticut could not sustain that burden here. The chock which struck the girder on the bridge did not protrude over the side of the barge. The barge was in the channel, and had the leaves of the bridge not extended over the channel, there could have been no contact between the chock and the girder. The violation of the statute was, as a matter of fact, a cause of the accident. The district court in In re Great Lakes Towing Co., supra, distinguished between the minor, or passive, negligence of the bridge owner and the active negligence of the ship and applied a sometimes-stated tort doctrine which exonerates one whose passive negligence does no more than create a static condition which makes the damage possible,[3] and held that the doctrine of The Pennsylvania, supra, did not apply to bridges.[4]
 
 
 10
 We hold that, where the violation of a statutory duty is a cause of an accident, that liability may not be avoided on causal grounds by drawing distinctions between active and passive negligence. It is axiomatic that the wider the water channel under a drawbridge the less is the likelihood that passing ships will touch the bridge. To excuse the negligence which narrows a navigable channel would, in our opinion, simply frustrate the congressional purpose to safeguard navigation. This view accords with the rationale underlying the decision in The Pennsylvania, supra. The result which we reach is in accord with the decisions in In re Wasson, 495 F.2d 571 (7th Cir. 1974); The Fort Fetterman v. South Carolina Highway Department, 261 F.2d 563 (4th Cir. 1958); Petition of McMullen & Pitz Construction Co., 230 F.Supp. 726 (E.D.Wis.1964); United States v. Norfolk-Berkley Bridge Corp., 29 F.2d 115, 125 (E.D.Va.1928).
 
 
 11
 The failure of the State of Connecticut to comply with the terms of the permit was a contributory cause of the allision between the bridge leaf and the chock, and the damages should be apportioned between the MORAN and the State of Connecticut.
 
 
 12
 The judgment is reversed, and the cause is remanded for further proceedings not inconsistent herewith.
 
 
 
 *
 Chief Judge of the United States District Court for the District of Montana, sitting by designation
 
 
 **
 Of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 The issues relative to the damages resulting from the allision with the bridge abutment are not before us on this appeal
 
 
 [2]
 The Rivers and Harbors Act of 1899, 30 Stat. 1151, 33 U.S.C. § 401, provides in part:
 . . . That when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of the Army, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of the Army.
 
 
 [3]
 Many courts have sought to distinguish between the active "cause" of the harm and the existing "conditions" upon which that cause operated. If the defendant has created only a passive, static condition which made the damage possible, he is said not to be liable. But so far as the fact of causation is concerned, in the sense of necessary antecedents which have played an important part in producing the result, it is quite impossible to distinguish between active forces and passive situations, particularly since, as is invariably the case, the latter are the result of other active forces which have gone before. If the defendant spills gasoline about the premises, he creates a "condition;" but his act may be culpable because of the danger of fire. When a spark ignites the gasoline, the condition has done quite as much to bring about the fire as the spark; and since that is the very risk which the defendant has created, he will not escape responsibility. Even the lapse of a considerable time during which the "condition" remains static will not necessarily affect liability; one who digs a trench in the highway may still be liable to another who falls into it a month afterward. "Cause" and "condition" still find occasional mention in the decisions; but the distinction is now almost entirely discredited. So far as it has any validity at all, it must refer to the type of case where the forces set in operation by the defendant have come to rest in a position of apparent safety, and some new force intervenes. But even in such cases, it is not the distinction between "cause" and "condition" which is important, but the nature of the risk and the character of the intervening cause. (Footnotes omitted.) W. Prosser, The Law of Torts 247-48 (4th ed. 1971)
 
 
 [4]
 The district court's conclusion that the doctrine of The Pennsylvania, 86 U.S. 125 (1873), did not apply to bridges was repudiated on appeal by the Seventh Circuit, although the judgment was affirmed because, at the time of the allision, the ship was outside the navigational channel and in an area not protected by the permit. Chicago & Western Indiana R.R. v. Motorship Buko Maru, 505 F.2d 579 (7th Cir. 1974)